## Case No. 7,657.

### KELLEY v. GREENLEAF et al.

[3 Story, 93.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1843.

PARTNERSHIP — FUNDS DIVERTED TO INDIVIDUAL PURPOSES—FUNDS TRACED—TREATED AS TRUST—EQUITABLE RELIEF.

1. Where a partner fraudulently, without the consent of his co-partners, applies the partnership funds to his private purposes and profit, or invests the same in his own name and for his own use, his co-partners may, if they can distinctly trace the investment, follow it, and treat it as trust property held for the benefit of the firm, by the partner or by any person in whose hands it may be, except a bona fide purchaser, without notice.

[Cited in Edwards v. Entwisle, 2 D. C. 46. Cited in brief in Wells v. M'Geoch. 71 Wis. 196, 35 N. W. 779. Cited in Gray v. Kerr, 46 Ohio St. 658, 23 N. E. 138; Bosworth v. Hopkins, 85 Wis. 59, 61, 55 N. W. 424.]

2. The same rule also applies to trustees and agents, and exists, not only in equity, but at law, wherever the right is of a legal nature.

[Cited in Lefever v. Underwood, 41 Pa. St. 509; Johnson v. Hersey, 70 Me. 77.]

3. In the present case, a bill was brought by A. against the representatives of his deceased partner B., and it appearing that B., without the knowledge and consent of A., appropriated certain partnership funds to the purchase of real estate, upon which there was a certain mortgage, it was *held*, that a decree be rendered in favor of the plaintiff, and the real estate be sold under a master, and the proceeds be applied, first to the discharge of the mortgage, and the residue to the discharge of the debt due from B. to the partnership.

---

[1] [Reported by William W. Story, Esq.]

Bill in equity. The present bill was filed by Morris Kelley, the surviving partner of Osgood Hoyt, against the administrator, widow and heirs of the said Hoyt, certain persons having an interest in the real estates, which are the subject of the bill, being made parties, and stated in substance: That the said Hoyt and Kelley entered into partnership on the 22d day of January, 1834, as stonecutters, and continued to carry on their business, as partners, until the partnership was dissolved on December 22d, 1841, by the death of the said Hoyt. That in the course of the said partnership, they became possessors of certain property, consisting of tools, stone, notes, accounts, &c., five-eighths of the sloop Almira, a certain store and land in Charlestown square. and a parcel of land in Causeway street, in Boston. That the said parcels of land were purchased by them with their copartnership funds, and on account of the partnership, and were always held, enjoyed and managed as a part of the copartnership stock; that in the year 1837 a granite stone building was erected by them on the land in Charlestown square out of the copartnership funds, and for copartnership use. That in account of stock taken on January 1st, 1839, all of the foregoing property was included, and set down as belonging to the copartnership stock, of which the said Hoyt and Kelley were equal owners, and were to share alike. That the said Hoyt had, from the first, and continued to have to the day of his death, the sole charge and management of all the financial affairs of the concern, receiving all the money, and making all the payments, keeping the books and accounts, and having charge of the papers, and the general care of all the property and concerns, except as to the stone and tools in the stone yard, and the management of the work there, and the execution of the jobs and contracts there, which, during the whole time of the partnership, was under the direction of the said Kelley. That when the said account of stock was taken, the said Hoyt agreed to pay and discharge all debts and demands of every nature then due and owing from the partnership, and would save the said Kelley harmless from all debts and demands, excepting that all contracts for work and materials, or any thing connected with the business of the firm made in 1838, and to be performed after January 1st, 1839, should be paid and discharged by the copartnership. That on February 2nd, 1840, they borrowed $1,500 from John Ford, for copartnership purposes, on a mortgage upon their said land in Charlestown square, to secure the note of the said Kelley and Hoyt, payable in three years, the whole interest of which, up to the death of Hoyt, was paid by him from the copartnership funds, and charged in the company's books. That between January 1st, 1839, and December 22d, 1841, the said Hoyt, as managing partner. received on the said firm's account $48,000 and upwards, and paid out for copartnership liabilities and purposes,

$37,361.09; and that the said Kelley drew out of the concern, during the same time, the sum of $1,422.98, and that the residue of the said partnership money, it being upwards of $9,600, so received by the said Hoyt, remains due from and unaccounted for by him to the concern. That the said Hoyt died leaving a widow and two children, minors, and the said [Thomas] Greenleaf was duly appointed administrator, and accepted the trust. That at the death of the said Hoyt the joint debts due from the said firm amounted to $7,400, exclusive of the claim of the plaintiff, and the copartnership assets, after being collected and sold, amounted to $5,480.84, and that there are various debts still due, and a large balance due to the said plaintiff, for which the said property is and should be holden to him, before the administrator, or heirs and widow of the said Hoyt, ought to have any portion thereof; but inasmuch as the title to one undivided half of the said copartnership assets in said estate is now, by the strict rules of the common law and the form of the conveyances, in the said two children of the said Hoyt, and as the same is also subject to the said widow's right of dower therein, the plaintiff cannot, without the aid of a court of equity, wind up the partnership concerns and make the said property, now existing in the shape of real estate, available for the payment of the partnership debts now outstanding, nor of the plaintiff's just claims thereon. That the plaintiff has received nothing from the said Hoyt's private estate since his decease, nor can he collect any thing therefrom, as the same is supposed by his administrator to be insolvent.

The bill further sets forth, that the said Hoyt, in the month of April, 1839, without any concert with the plaintiff, and without his previous knowledge, and (as the plaintiff at the time supposed) on his private account, purchased a certain lot of land in Charlestown, situated on Bow street, and took the conveyance thereof in his own name, and erected a dwelling house thereon, which he occupied to the time of his death. But the plaintiff has since discovered, that the said Hoyt wrongfully and fraudulently applied the copartnership funds to the whole payment for the said land, and to the whole cost of the said dwelling-house thereon. That the plaintiff discovered this misappropriation, during the last sickness of the said Hoyt, and that the said Hoyt, shortly before his death, declared, that the said dwelling house belonged as much to the plaintiff as to him, (Hoyt), and that it was built out of the firm's money, or words to that effect; and that the plaintiff afterwards found the deed thereof, filed with the other deeds of the copartnership lands in Charlestown square and in Causeway street, and the other papers and documents of the firm. That the plaintiff believes, that Elias H. Davidson claims to hold a mortgage upon the said dwelling house in Bow street, to secure a private debt due from

the said Hoyt to him, as administrator of his father, Elias Davidson. That the said minor children, to whom one undivided half of the said property equally descends in fee, are incapable of conveying the said real estate to the plaintiff, as surviving partner, so as to enable him to wind up, adjust, and liquidate the affairs of the concern. That the said widow claims, that she is entitled to dower, and that the said Greenleaf claims to hold the said real estate as the private property of the said Hoyt, and threatens to sell the same for the payment of the private debts of the said Hoyt. The bill concludes with a prayer, that the said real estate may be deemed to be partnership property and assets, and that the same may be ordered to be sold for the purpose of winding up the partnership concern, and that a receiver be appointed, and that the administrator, widow, and heirs be restrained and enjoined from proceeding to take any measures to sell the same, or to have dower set off to the said widow, until the relative rights of all parties can be settled and determined.

The answer admits generally the facts stated in the bill, and goes on to state, in answer to certain interrogatories, that one or two days before the day of the decease of said Hoyt, the defendant, Greenleaf, called to see said Hoyt, at his request, which was suggested to him by Mr. Wesson; and said Hoyt then asked or requested him (Greenleaf) to take charge of his business, and his accounts, and said if he would he should die in peace, as he thought he would take good care of his children. He declined; but, after earnest solicitation, consented. He questioned said Hoyt about his business, who said, "You and Kelley (who was then present) go down stairs and fix it up, and let me know." They went down, and looked over the books some five or six hours, during which time said Hoyt sent for Greenleaf a number of times, and when he went up stairs to see said Hoyt, he sometimes found him wandering, and out of his head. He found the books so confused, that it was impossible to make any satisfactory statement of the state of the firm to said Hoyt, and so informed said Hoyt. He then asked said Hoyt, if he was not well enough acquainted with the partnership affairs, to make an offer of what he would take for his interest therein? Said Hoyt replied, he thought said Kelley ought to pay, for the use of said Hoyt's wife and children, about twelve hundred dollars, and then he, (said Hoyt,) would give up all. Said Kelley, after consultation with him, (said Greenleaf,) declined this offer, which he communicated to said Hoyt, who was then desirous to have said Kelley make him an offer of what he would give for said Hoyt's interest in said partnership. This Kelley declined. He then asked Hoyt, "How this house stood?" (meaning the house near Bow street, where said Hoyt died.) Hoyt replied, "The house belongs as

much to Kelley as to him," (Hoyt.) At this time, said Kelley was present, and one other person, whom he does not now recollect. The answer goes on to state, that as administrator and guardian, as aforesaid, the defendant claims the estate near Bow street as the private and separate estate of the said Hoyt. That he has, for the purpose of closing the business of said estate, threatened to apply for leave to sell the said estate near Bow street, but has not intended so to do until this honorable court decides the rights of the several parties to the said Bow street estate.

The cause was set down for a hearing upon the bill, and answers, and evidence.

Mr. English, for plaintiff.
James Dana, for defendants.

For the plaintiff the following points were made: (1) That Hoyt purchased the land and built the house out of the copartnership money. (2) That Hoyt was the managing partner, and had the care of the books and money, while Kelley's branch was the executive department in the stone yard. (Hoyt and Kelley were stone cutters and dealers in building stone.) (3) That Hoyt abstracted the funds to buy the said land, and build the said house, from the copartnership funds, in fraud of Kelley, and the copartnership creditors, and concealed this misuse of the money from Kelley until shortly before his death. (4) That Kelley's copartnership lien on the funds so used fraudulently by Hoyt, who stood in the relation of trustee or agent for the concern, continues, notwithstanding their conversion into real estate, as against Hoyt and his personal representatives. (5) That Davidson, the mortgagee of the house, who appears to have taken the mortgage without notice, and bona fide to secure a loan of $1000 to Hoyt, has the higher equity to the extent of his mortgage. But as to the equity of redemption beyond the mortgage, Hoyt in his life time, and his heirs since his decease, are the trustees thereof for the benefit of the surviving partner and copartnership creditors. The object of the bill is to have the real estate sold and applied to payment of joint debts, and the copartnership balance due to the surviving partner, and the residue, if any, distributed according to the interests of the parties. Hoyt's heirs at law are minors, but Greenleaf has been appointed guardian ad litem.

For the defendants the following points were made: As to the case of the estate on Charlestown square, and the estate on Causeway street, mentioned in the bill, the defendants are satisfied, that they were purchased with partnership funds for partnership purposes, and always intended by the partners to be held and used for partnership purposes. Under this state of facts the cases of Hoxie v. Carr [Case No. 6,802]; Burnside v. Merrick, 4 Metc. (Mass.) 537; Dyer v. Clark, 5 Metc. (Mass.) 562; and

Howard v. Priest, Id. 582,—seem decisive, and the defendants will not therefore object to the prayer of the bill as to the two estates above named. But as to the estate on Bow street, the defendants do object to the prayer of the bill, and claim to hold the same as the separate estate of Hoyt, the deceased partner. (1) As to this estate, they do not admit, that it was purchased with partnership funds, or for partnership purposes. (2) If it was purchased with partnership funds, they do not admit, that Hoyt was such a trustee for the firm, that the investment was made for the benefit of the partnership, and can now be followed and reached by the surviving partner. (3) If this estate was purchased with partnership funds, and the evidence should satisfy the court of this fact, the defendants contend, that there was an agreement between the partners, that Hoyt should make the investment for his private account; or that Hoyt made the investment, and constructed the house, with the knowledge and assent of Kelley, his partner.

STORY, Circuit Justice. The cause at the argument has been narrowed down to the simple consideration, whether the house near Bow street, called for distinction's sake the Bow street house, is to be deemed partnership property or not. The principles of law involved in the cause do not, in my judgment, involve any serious doubts. In the first place, it is a general rule in equity, that if a trustee, contrary to his duty, invests the property of his cestui que trust, or beneficiary, in any other property, either real or personal, the beneficiary has a right, if the wrongful conversion shall be clearly made out, and the property can be distinctly traced, to follow it into the hands not only of the trustee, but of any other party claiming under him, who is not a bona fide purchaser thereof for a valuable consideration, without notice. I need not cite particular cases on this point. They will be found cited and commented on in 2 Story, Eq. Jur. §§ 1258–1260. In many cases, the same doctrine is upheld at law, wherever the right is of a legal nature; of which the cases of Scott v. Surman, Willes, 400, and Taylor v. Plumer, 3 Maule & S. 574–576, afford striking illustrations, founded upon very different circumstances. The same doctrine is equally as applicable to cases of agents as it is to cases of trustees. Story, Ag. § 205, and authorities there cited. In the next place, partners fall within the same predicament as trustees and agents. Indeed, their functions, rights and duties, in a great measure, comprehend those both of trustees and agents. See Story, Partn. §§ 130, 131, and authorities there cited. The result of these principles is, that if a partner fraudulently or improperly, without the consent of his partners, applies the partnership funds to his own private purposes, or for his own private profit or emolument, or invests the same improperly in his own name and for his own

use, the other partners have a right, if they can distinctly trace the investment, and elect so to do, to follow the partnership funds into the new investment, and treat it as trust property held by that partner for the benefit of the firm, and as liable to be accounted for by any person, into whose possession the same may come, who is not a bona fide purchaser for a valuable consideration, without notice. Hence, if the defrauding partner dies, his representatives can stand in no better situation than the partner himself would, if living; and the same rule applies to the private creditors of the deceased partner; they are not entitled to make claim thereto any more than they can to any other mere trust property held by the deceased. Upon these grounds, the mortgagee, Davidson, is entitled, to the extent of his mortgage, to be protected, and to have a priority of right of payment out of the Bow street estate, as being such a purchaser. But neither the widow, nor the children, nor the administrator, nor the private creditors of Hoyt, are entitled to any such protection or priority.

The whole question here, then, resolves itself into these questions: (1) Whether the partnership funds have been applied to the purchase of the Bow street house. (2) Whether, if so applied, it has been a secret and fraudulent application of those funds; or has been done without the express consent of the plaintiff. (Kelley), or without his implied consent, resulting from his knowledge of the facts, and his acquiescence in the appropriation. In my judgment, both of these questions must be answered in the affirmative, and in favor of the plaintiff. And I will very briefly state the grounds of this opinion.

In the first place, there is direct and positive evidence, that a considerable part of the purchase money for the Bow street estate was actually paid out of the partnership funds. The check drawn on the Phoenix Bank for $500, was clearly so; and the direct evidence of several witnesses proves, that other sums were also paid and admitted by Hoyt to have been paid out of the partnership funds. The whole cost of the investment seems to have been about $3000. Of this $1000 was borrowed of Davidson by Hoyt, for which the mortgage was given; and is now a lien or charge on the estate, entitled to prior satisfaction. This is admitted on all sides. Of the remaining $2000, the presumptive proof seems very strong, that besides the $500 check, the $400 paid to Mullikin and the $800 paid to Evans, were paid out of the partnership funds. Certainly a part of Evans' bill was so paid. The total absence of all proof of any private funds of Hoyt, capable of being applied, or actually applied, to discharge the debt, seems to furnish aid and strength to this conclusion. The onus probandi is certainly on the representatives of Hoyt, under the circumstances of the case, to show some mode by which these debts were paid out of his private funds, especially as it is manifest, that Hoyt

did, in fact, apply the partnership funds to these purposes, and, what is most material, without ever charging himself with a single dollar in the books of the firm, although he exclusively kept them. Upon the death of Hoyt, a large deficit is found in the funds of the firm, all of which were in Hoyt's hands, and exclusively under his management. How is this deficit accounted for? In no way. Not a scrap of proof to show the time, or the mode, or the occasion of using them. Take then the case in this aspect, and we see, that there is a large deficiency in the assets of the firm, held by Hoyt; we know that a part of the money of the firm was applied to pay for the house; and we have no evidence, that there were any private funds of Hoyt applicable or applied to the purpose. Under such circumstances, the reasonable conclusion is, in the total absence of all counter proof, that the assets of the firm, to the amount of the $2000 remaining after deducting the mortgage, were supplied from the partnership funds. Hoyt, at his death, is admitted to have been insolvent.

Then, in the next place, were the funds so applied, withdrawn and applied with the consent of the plaintiff (Kelley), or with his knowledge or consent, or were they fraudulently so withdrawn and applied? In the first place, we must look at the means of knowledge possessed by the plaintiff (Kelley), and whether there is any reason to suppose, that the funds had been or were about to be applied. No cross bill has been filed to sift his conscience on this point; and therefore, we may presume, that the inquiry has been waived, because he has not been examined on oath, as a defendant to a cross bill; and he has, on oath, sworn to the original bill, and averred his total want of knowledge of the facts. In the next place, it is clear, that Hoyt was what is called the indoor partner. He exclusively kept the books; he received all the money of the firm, and he paid all the disbursements and debts incurred by the firm. The plaintiff, on the other hand, confined his attention entirely to the outdoor business and superintendence of the stone cutting operations. He appears to have had unbounded confidence in Hoyt, and does not appear ever to have examined the books; and indeed seems to have been an ignorant man in all such business. Besides, if he had examined the books, he would not have been able to find there a single charge made by Hoyt for moneys taken, or advanced to himself. So that unless the fact, that there were no such charges there could have aroused suspicions on his own part, which it certainly did not, he could not have any means of detecting any misapplication of the partnership funds. In truth, there is no reason to suppose, that he ever made any examination or inquiries into the subject. He took for granted, that Hoyt was honest, and, as it is manifest, until Hoyt's death, he does not seem to have been aroused to a state of inquiry or suspicion.

But then it is said, that he knew, that the house was building by and for Hoyt. Certainly he did; but it is plain, that Hoyt might be fairly presumed by him to have had personal credit to raise the requisite funds; and, in an easy indolent confidence, he was lulled to indifference as to the mode in which Hoyt obtained the funds, since he had no doubt of his actual solvency. Upon the whole of this matter, the statement of the witness Welch, is most significant to the 4th direct interrogatory. He there says: "Sometime in 1839, I can't mention the exact date, I told Mr. Hoyt, that his books were not kept properly, so that any body could understand them. He told me then, that all he wanted me to do was, to write down what he told me to. For a little while, I did that. I then asked him why Morris Kelley was charged with cash, and none charged to him. He said he understood all about that; he kept his own account of cash received out of the concern. I then asked him if he kept a cash account with the concern, and he said he did. I asked him to let me see it. He handed out a pile of bills from his secretary, and said that was his cash account. I mean by bills, receipts. I told him, that was not right. I then told him if he would hand me that pile of bills, I would open a cash account from them. He brought the pile of bills about a week after into my store, with a book, and asked me to open a cash account. I did so; but in this pile of bills were his own private bills, which I did not enter. After I had entered all the bills he had paid for the concern, and debited all cash received, which I took from the day-book, I asked him to come into the store and we would try to strike a balance. He went into the store with me, but he would not agree to that, and said he did not care any thing about striking a balance now, and took up his book and bills and went out of the house. About a week after, he wanted me to go on posting his books, but I refused to do it, on the ground, that I did not wish to have it said, that I had any thing to do with such books, but proposed to him to open a new set of books by double entry. He agreed to it, and authorized me to purchase books. I bought a couple of books, suitable for double entry, which I gave him; but he returned them, and took another book in place of them, and asked me to copy from an old ledger he had; which I did. This was done with a view to open a new set of books by double entry, which was never done. I saw my cash account, a year after I made it, and no additions had been made to it."

Now upon such a subject, under such circumstances, it is only necessary to advert to the general doctrine of courts of equity. It will be found summed up, and the authorities cited, in section 468 of Story on Equity Jurisprudence, as follows: "Courts of equity adopt very enlarged views, in regard to the rights and duties of agents; and in all cases, where the duty of keeping regular accounts and vouchers is imposed upon them, they will take care, that the omission to do so shall not be used as a means of escaping responsibility, or of obtaining undue recompense. If, therefore, an agent does not, under such circumstances, keep regular accounts and vouchers, he will not be allowed the compensation, which otherwise would belong to his agency. Upon similar grounds, as an agent is bound to keep the property of his principal distinct from his own, if he mixes it up with his own, the whole will be taken, both at law and in equity, to be the property of the principal, until the agent puts the subject matter under such circumstances, that it may be distinguished, as satisfactorily, as it might have been, before the unauthorized mixture on his part. In other words, the agent is put to the necessity of showing clearly, what part of the property belongs to him; and, so far as he is unable to do this, it is treated as the property of his principal. Courts of equity do not, in these cases, proceed upon the notion, that strict justice is done between the parties; but upon the ground, that it is the only justice, that can be done; and that it would be inequitable to suffer the fraud or negligence of the agent to prejudice the rights of his principal." Every word of this passage is equally applicable to the case of a partner acting as the agent of a partnership. The statements and conversations of Hoyt on his death bed strongly corroborate the view of the facts already taken. It is suggested, that, as these conversations and statements took place near the close of his illness, (he died of consumption), that he was probably insane at the time, and they ought not to be relied on as evidence. My opinion is, that the evidence clearly shows, that he was at the time in full possession of his senses and understanding. In one of these conversations Hoyt stated, "The house belongs as much to Kelley as to him;" and Kelley was present at the conversation.

Upon the whole, my opinion is, that the Bow street house was purchased with the partnership funds without the knowledge or consent of Kelley to the appropriation, and was a secret, and in a legal sense, a fraudulent appropriation of those funds, to the amount of $2,000; and that a decree ought to be rendered in favor of the plaintiff, and the house near Bow street, and the store on Charlestown square, and the lot of land on Causeway street, mentioned in the bill, be sold under the direction of the court, by a master, and that the proceeds be brought into court, first to apply so much thereof as are necessary to discharge the mortgage, and to apply the residue thereof to the discharge of the debt owing by Hoyt to the partnership. And let it be referred to the same master to state an account of the partnership debts and credits, and the balance due by Hoyt to Kelley on the partnership account, with the usual powers given to the master on such oc-

casions to examine either party on oath, and to require the production of the partnership books, and all documents and vouchers in the possession of either party, touching the premises.