The following opinion was delivered at special term:
Spier, J.
The action is brought against the defendants for violating the plaintiffs’ trade-mark, consisting of a circular label or stamp, marked and letters “Captain S. Pepper’s Extra Signal Oil.” An arrangement had been made by which the parties, plaintiffs and defendants, had jointly as copartners, manufac *62 tured this oil and the factory was known, and published, “F. O. Ketcham & Co., Manufacturers.” The' defendants claimed not only to have knowledge of the secret process of making the oil, but also that they, in their arrangement with the plaintiffs and the original inventors for carrying on the business, had made a contract by which they had the right to use the trademark, and were in fact owners of it and the secret.
After the dissolution the defendants continued to make what they called “Captain Pepper’s Extra Signal Oil,” and to use the trade-mark.
The plaintiffs brought their suit to restrain defendants, by injunction, claiming that they were the proprietors of the trade-mark, and were alone possessed of the secret process of manufacturing the oil, and alleging that the defendants were making a spurious article and selling it in the market for the genuine oil.
The co-partnership arrangement made by the parties, was for the purpose of carrying on the business of making and selling this oil.
•The compounding the ingredients was by arrangement exclusively intrusted to the plaintiffs as their special business in the copartnership, while the selling of the oil, and other labor necessary to create a market, and the taking all necessary steps in preparing it as merchandise merely, was the defendants’ department.
I have no difficulty in finding that the issues in the pleadings have been clearly made out by the evidence in favor of the plaintiffs, and that they are entitled to the judgment asked for in the complaint.
Frank Warner Angel, attorney, and of counsel for appellants, among other things urged;—I. Weston took the trade-mark as trustee of the firm (Mitchell v. Read, 61 Barb. 310; Colly, on Part. § 179; Smith Merc. L. 54; Featherstonhaugh v. Fenwich, 17 Vt. *63 298; Pawcett v. Whitehouse, 1 Russ. & Myl. 132; Russel v. Austwich, 1 Linn. 52; Colly, on Part. § 182; 1 Sto. Eq. Jur. §§ 468, 623; Kelly v. Greenleaf, 3 Story, 93; Keech v. Sanford, 1 Lead. Cas. Eq. 92).
II. The doctrine of Vigilantibus et non dormientibus equitas subnenit, does not apply. It only applies where a party being apprised of the act about to be done, slumbers on his rights; for the betrayal of confidence reposed, the skillful lulling to rest of the intended victim, the adroit closing of every avenue through which apprehension might enter, whether this be done by words or by “expressive silence” are the eararks of successful fraud the world over; and a court of equity, should it make such a perverse application of one of its fundamental maxims, would become the efficient ally of the vigilant wrongdoer, prove recreant to its past history and the principles on which its very jurisdiction rests.
III. Having shown that this agreement with Mrs. Pepper was taken by Weston, as trustee of the firm, the next question is, what becomes of the trademark on the dissolution of the firm? On dissolution of a partnership, each of the partners has the right, in the absence of a stipulation to the contrary, to use the trademark (Banks v. Gibson, 34 Beav. 566; Smith v. Everett, 29 Id. 446; Johnson v. Hillsley, 2 D. J. & S. 446; Comstock v. Moore, 18 How. Pr. 421).
A. J. Perry, attorney and of counsel for respondent, urged ;—I. The exclusive right to the use of the trade-mark described in the complaint is shown by the evidence of the plaintiffs. Vide opinion of the court; finding of fact; conclusions of law.
II. Ketcham recognized and acquiesced in the knowledge of the secret and proprietary interest of Weston and Mrs. Pepper to the trade- mark.
*64 By the Court. — Curtis, J.
To sustain this action, the plaintiff must establish an exclusive right to use the alleged trademark in question. The plaintiffs claim that through one of them, George N. Weston, they possess such exclusive right.
The plaintiff Weston, testified at the trial, that about September 1, 1870, he made ail arrangement with Mrs. Pepper that she was to have ten per cent, of the gross profits of the manufacture of this oil, by the firm, consisting of the defendant, Ketcham., and himself, for the use of her husband’s name; that he was to make it, and the firm have the benefit of it. Subsequently about January 1, 1872, and after the plaintiff Piske became a mem ber of the firm, and the firm having paid the ten per cent, to Mrs. Pepper, a new agreement was made between the plaintiff Weston and Mrs. Pepper, by which Mrs. Pepper allowed the plaintiff Weston, or any firm of which he may be, or become a member, as he may desire, the exclusive use of the trade-mark, on paying to her for five years one hundred and fifty dollars per annum, and on punctual payment at the end of five years, she covenanted to render and yield up the trade-mark for his own use forever.
The evidence of the plaintiff Piske in respect to this new agreement, was as follows:
“ Q. What conversation was had between yourself, Ketcham and Weston, in regard to the agreement which should be made for the firm’s benefit, with Mrs. Pepper %
“A. We were anxious to have an agreement made, and wanted the best one possible.
“ Q. What instructions, if any, did you give to Mr. Weston before he went to Mrs. Pepper for this purpose ?
“A. To make the best arrangement possible.
‘ ‘ Q. For the firm’s benefit ?
*65 “A. Yes, sir.
“ Q. Did he comply with your instructions ?
“ A. He did.”
The plaintiff Weston testified, “It was talked over between us beforehand, that I was to make the best arrangement with Mrs Pepper that I could.”
“ Q. He instructed you to do it ?
“A. Yes, sir.
“ Q. Who instructed you ?
“A. F. O. Ketcham.
“Q. After it' was done, did he know what was •done ?
“A. He did.”
On his cross-examination he further testified, as follows:
“ Q. You went to her while a.member of the firm of F. O. Ketcham & Co., under the instruction from your partner to do the best you could %
“A. Yes, sir.”
The defendant Ketcham testified :
“ Q. Why was the change made from ten per cent, to the sum of one hundred and fifty dollars a year ? What conversation, if any, did you have with your co-partners before this agreement of one hundred and fifty dollars was entered into ?
“ A. Mr. Fiske suggested that we should have a different arrangement with Mrs. Pepper, and we talked the matter over between us, and came to a definite sum. Then Mrs. Pepper called on us several times at our office : had conversation with Mr. Fiske, Mr. Weston and myself, relative to the matter,—and came to a conclusion what she would do. She then left us and went home. We then talked the matter over between us, and agreed between us to give her so much money for her right, title and interest in the mark. Mrs. Pepper and me talked the matter over, and we had sev *66 eral conversations about it. I don’t remember all the conversations.
“Q. You had several conversations with her 2
“A. Yes, sir.
“ Q. Where 2
“A. At the store.
“Q. About what time 2 before the agreement was made 2
“A. This conversation was held, I think, in the month of December, 1871.
' “ Q. Several conversations with her 2 What were those about 2
“A. About this name—this trade-mark — this name.
“Q. What did you want to know about it 2
“A. We wanted to change it from the ten per cent, and give her a certain sum of money, for so many years.
“Q. Was that the whole of it 2
“A. Yes, sir.
“ Q. You wanted to give a certain sum of money, for so many years, at the expiration of which the trade-mark should belong to you 2 “A. No, sir-; to the firm.
“Q. You wanted to buy it for the firm 2
“ A. Yes, sir.
“ Q. That was your object in having these conversations with Mrs. Pepper 2
“A. Yes, sir.”
The question arises whether upon this evidence which is undisputed, the agreement of January 1, 1872, made between the plaintiff Weston and Mrs. Pepper, operated as a matter of law to vest the right to use this trade-mark in the firm, or in Weston indi- ■ vidually. It will be observed that the consideration for it was paid by the firm out of the moneys of the firm.
*67 If we look at the analogies of the law, as, for example, at the renewal of a lease by a partner in his own name which had been originally granted to the co-partnership, some light may be thrown upon the effect of the transaction, for this agreement with Mrs. Pepper for the use of the trade-mark for five years, and then conditionally to vest, is in the nature of a lease and the same controlling principles apply to it.
In Mitchell v. Read (61 Barb. 310), it was held, that where, before the expiration of a co-partnership, one partner, without the consent of his co-partner, obtained a new lease of the place of business of the firm in his own name, to commence before the partnership ends, such lease vested in the lessee as trustee for the firm. In Burrill v. Bull (3 San. Ch. 15), Sanford, V. C., thus speaks of an analogous occurrence :
“It was a transaction by which one of three joint owners of a lease, deputed by his associates to obtain its renewal for the common benefit, and availing him- . self of his part ownership and his connection with the property to obtain such renewal, procured it in his own name, Tmd attempted to shut out his associates from sharing in its advantages. It is, in short, an unmitigated fraud, against which courts of equity have ample jurisdiction to grant relief.”
Courts of equity have inexorably frowned upon the attempts of one partner to secure any individual advantage in transactions entrusted to him, affecting the rights or property of the co-partnership. He is held to the highest acconntability as an agent, and the agency is one that in every commercial community invokes the highest confidence and responsibility, and should be protected by every safeguard.
In the case under consideration, the plaintiff Weston went, at the request of his co- partners, to make a new arrangement as to what should be paid for the future use of the trade-mark, the right to use which *68 the firm already possessed on payment of ten per cent, of the gross profits. It is undisputed that the firm up to its dissolution, January 30, 1874, paid from its funds the annual sum to be paid, under the agreement which he took in his own name. If the law is to be applied to this transaction upon the facts as they appear, that is applied to similar transactions by a partner in respect to taking the extension of the firm’s lease in his own name, it is quite certain that the plaintiff took nothing by the agreement, except as trustee for the firm.
But there are considerations urged by the plaintiff, which, it is claimed, should make this case an exception to the general rule. It is said, and so found by the referee, that this agreement, upon its execution, came to the knowledge of the other two partners, Fiske and Ketcham, and that they severally ratified the same.
Fiske, one of the partners, and now one of the plaintiffs, says he saw and read the paper soon after it was executed, and expressed his disapprobation, and then proceeds to testify:
“ When the paper was drawn up I thought, being a member of'the firm of F. O. Ketcham & Co., I should have an interest in that trade-mark as well as Weston, but Mrs. Pepper decliued to give it to any one but Weston, and we acquiesced in that, to pay her one hundred and fifty dollars a year.
“Q. What else did you say in stating your disapprobation?
“ A. That is the substance of it.
“ Q. Did you say anything to Mr. Ketcham in. regard to your disapprobation of this contract?
“A. I did.
“ Q. Please state what that was?
“A. General disapprobation.
“ Q. Why did you disapprove of it?
“ A. I thought it was not fair.”
*69 The plaintiff Weston testifies :
“Q. What remark if any did Mr. Ketcham make when you showed him that agreement ?
“A. I don’t remember whether he made any at thé time I showed it.
“Q. Did he make any afterwards ?
“A. I have heard him make a great many since.
“Q. In regard to this agreement?
“A. Tes, sir.
“ Q. What was the substance of the remark?
“A. He thought I ought to let him in and let him have an equal interest.”
On his cross-examination he testified :
“Q. Did you say anything to Messrs. Fiske and Ketcham as to your influence with Mrs. Pepper ?
“A. I probably have ; I don’t remember, though.
“ Q. Did you state to them that you thought, owing to your influence, you could make the best bargain in this matter ?
“ A. Probably I did ; I would not swear that I did.”
Albert Johnson, who occupied the same office with .the firm, testifies in respect to this agreement:
“ Q. Do you remember hearing it talked about by Mr. Ketcham and his co-partners Fiske and Weston ?
“A. I do.
“Q. State to the court what you recollect hearing him say on the subject of this agreement on Mr. Ketcham?
“A. The only thing I remember, and I can not give the words for that, Mr. Ketcham did not like it, and was angry because the paper was made out in the name of Greorge H. Weston and not in the name of the firm.
“ Q. What did he say in reference to that?
“A. I can not say what he said in regard to that. He did not like it.”
*70 The evidence is uncontradicted that the two other partners refused to approve or recognize this agreement made by Weston in his own name, as a proper discharge on his part of the duty confided to him by the firm.
It is to be presumed that the court in finding that they did ratify it, based that finding upon the fact that the firm continued to use the trade-mark and conduct the business of the manufacture of the oil the same as before, and did not resort to their legal remedy. This is more in the nature of acquiescence than ratification ; and again, such acquiescence was doubtless forced and not voluntary, for Weston alone knew the secret of making the oil, and if they had moved in the matter adversely to him, they would, in asserting their remedy, not have possessed the knowledge by the use of which the capital employed in the manufacture of the article, no part of which was contributed by Weston, might be made remunerative. It seems to be inequitable, under such circumstances, to decide that, because they refrained from attacking the transaction at once, they acquiesced in or ratified it, and, least of all, that there was a ratification of it in the sense of waiving any equitable rights that it gave the firm. This forced quiescence on the part of the other members of the firm can hardly be held sufficient to sustain tile finding of the court, that there was a ratification of this agreement.
It is urged by the respondent, and the court so finds, that Ketcham never knew the mode of manufacturing this oil. This is advanced as a reason why he should be restrained from using the trade-mark. The answer to this is obvious. He may become possessed of such knowledge, and even if he sells a different article from what he by the trade-mark represents it to be, • his responsibility is to those whom he deceives. His ignorance, or his selling another article, does not con *71 fer on the plaintiffs any rights to restrain him from interfering with what does not belong to them any more than to him exclusively.
The plaintiff Weston bargained for this right at the request of the firm, and for the use of the firm, and the funds of the firm paid for the use of it and for the acquisition. It is left by the articles of dissolution an equitable asset of the firm. The plaintiffs by their own showing are not in a position to ask equitable relief, and they fail to establish any exclusive right that entitles them to an injunction.
In this aspect of the case, it becomes unnecessaiy to consider the questions raised by the exceptions taken on the accounting for damages, or the other exceptions raised in the case.
The judgment appealed from should be reversed with costs to appellants to abide the event of the suit, and a new trial granted, and the order appealed from should be affirmed, with costs, as I concur also, in that respect, with the views expressed by Judge Freedman.