## Macey & Hamilton and others *vs.* T. B. Childress and others.

### October Term, 1875.

Parties—Bill by surety for indemnity—Misjoinder.—Creditors secured by a trust assignment, who have filed a bill against the trustee and his surety for an account, are neither necessary nor proper parties defendant to a bill by the surety against the maker of the trust upon an alleged promise of indemnity by him, and this although it be charged that the bill of the creditors was filed at the instance of the maker of the trust or his attorneys, or both, in order to throw the burden of the trustee's default on the surety.

Motives of parties to a bill.—It is no defence to a legal demand, instituted in the mode prescribed by law, that the plaintiff is actuated by improper motives.

Statute of frauds—Objection by demurrer.—If the bill show on its face that the contract sued on is in parol, the objection of the statute of frauds may be made by demurrer.

Promise of indemnity—Accrual of right of action.—If the promise be to indemnify against liability, the right of action accrues as soon as the party becomes liable to pay, and is not postponed until actual payment.

Statute of frauds—Parol promise to indemnify.—A parol promise by the maker of a trust assignment for creditors to indemnify a person, who, at

his request, becomes a surety for the trustee on his bond, given for the faithful performance of his duties, is, it seems, within the statute of frauds.

SAME—CHARACTER OF PROMISE.—But if a parol promise of indemnity can be valid, it must be express, and established beyond a reasonable doubt.

*John M. Gaut,* for complainant in cross-bill.
*John Reid* and *J. L. Rice,* for defendants.

THE CHANCELLOR :—On the 17th of December 1860, John W. Martin conveyed to the defendant T. B. Childress a large amount of property, real and personal, in trust for creditors, with power of selling, collecting, and disbursing. On the 26th of July, 1861, the said Childress qualified as trustee, by giving bond, with Temple O. Harris and James A. McMurry as his sureties, in the penalty of $40,000, payable to the state of Tennessee, conditioned for the faithful performance by Childress " of all the duties imposed upon him by law and the terms of the trust deed."

The original bill in this cause was filed on the 24th of December, 1873, by several of the creditors secured in the deed of trust, for themselves and all other creditors thus secured, against Childress and Harris, McMurry being dead and his estate insolvent, charging that Childress had misappropriated the trust assets, calling for an account, and asking for a decree against him, and Harris as his surety upon his said bond, for any balance found due.

The defendants have answered this bill. And, on the 18th of August, 1874, the defendant Harris filed a bill against the complainants in the foregoing bill, his co-defendant, Childress, and one J. W. Ewing, the latter alleged to be the successor of Childress as trustee, which he asks may be taken as a cross-bill, or as an original bill, if necessary, in the nature of a cross-bill, and heard with said original bill.

Harris' bill states the execution of the deed of trust by Martin to Childress, and that the latter was the brother-in-law of Martin. It then charges that complainant had no intimate relations with Childress, but had been a partner, and upon the most intimate terms, with Martin. That he was induced to execute the bond by Martin, never having

seen Childress on the subject. That Martin came to him and explained his reason for executing the deed; that it was made for his benefit, in order to prevent a sacrifice of his property; that he was amply good for his debts, having property enough to pay them and leave him in easy circumstances; that Childress could not act without giving security, and unless he, Martin, could obtain security for him, his property would be sacrificed. That he further said: "If you," meaning complainant, Harris, "will go and sign Childress' bond as trustee, I promise you that you shall never be held liable upon the bond, or annoyed about it in any way." Relying upon these assurances and promises, complainant went with Martin to the county court clerk's office, who called for the bond, and complainant thereupon executed it. He never would have signed the bond for Childress, or at his request, but did sign it for the benefit of Martin, at his request, and upon his promise as aforesaid.

Harris further states that, having executed the bond, he relied upon the promises of Martin, supposing that he would watch over the conduct of his trustee, and dismissed the subject from his mind; and, although seeing Martin often, never heard any complaint of Childress' conduct until the year 1871. That Martin has continued to be, and is now, in the possession of a large portion of the real estate conveyed in said trust deed, of value sufficient to more than pay all the unpaid debts of Martin secured by the deed, including the debts of the creditors whose names are used in filing the original bill. That said creditors filed said bill at the instance of the said Martin or his attorneys, or both, for the express purpose of relieving the property of said Martin, and throwing the burden upon complainant. That Martin and Ewing were not made parties to said bill for the express purpose of preventing complainant from setting up his equity against Martin and his said property; and the complainants in the original bill are called upon for a discovery upon these matters. The bill prays that, if the complainants in the original bill are found to be creditors

·entitled to satisfaction of the trust assets, that the property in Martin's possession be sold and applied to the payment ·of such debts, and other trust debts, before coming upon .him, etc.

The complainants in the original bill demur to this bill, and for cause of demurrer say that, whether filed as a ·cross-bill, or an original bill in the nature of a cross-bill, it has no equity upon its face, the matters relied on being *res inter alios acta,* and entitling the said Harris to no relief :as against them.

The defendant John W. Martin also demurs, assigning :for causes, that the bill has no equity on its face; that, if it were true he promised the said Harris, verbally, to save him harmless as security of Childress, such promise would not be binding upon him either at law or in equity; that, if the promise were binding upon him, he could not be sued by Harris until after he had sustained loss, and then only in a court of law.

The complainants in the original bill being creditors of John W. Martin, secured by the deed of trust to Childress, and for whose benefit the bond of Childress, as trustee, with Harris as his surety, was executed, and the bill of Harris in no way implicating them in the supposed contract of indemnity between Martin and Harris, it is clear that Harris has no right of action against them, growing out of such supposed contract, either by cross-bill or original bill. Not by cross-bill, for the matter set up is no defence to the bill of the creditors, nor entitling Harris to any relief as between him and any of the parties to that suit. It is only by bringing in a new party not necessary to the relief prayed in that suit, and against whom relief is sought, not upon the contract therein mentioned, but upon a new and independent contract, that the relief claimed could be had. Such a case does not justify the filing of a cross-bill, upon any rule of chancery practice recognized by the authorities. *Hildebrand* v. *Beasley*, 7 Heisk. 121 ; *Cobb* v. *Baxter*, 1 Tenn. Ch. 405, and cases cited. Not by original

bill, for they are not necessary parties to the relief sought. The contract relied on, if valid, would only entitle Harris to relief against Martin, not against them, who are actively engaged in pursuing their rights. *Saylors* v. *Saylors*, 3 Heisk. 582; *Watson* v. *Sutherland*, 1 Tenn. Ch. 208; *Holditch* v. *Mist*, 1 P. W. 695; *Wright* v. *Simpson*, 6 Ves. 714; *In re Babcock*, 3 Story, 93. The allegation that the original bill was filed at the instance of Martin or his attorneys, or both, in order to throw the burden upon Harris, is not sufficient to affect this conclusion. For the fact, if conceded, would not deprive the creditors of their legal right to have satisfaction out of the trust assets in the first instance. It is no defence to a legal demand, instituted in the mode prescribed by law, that the complainant is actuated by personal or improper motives. *Forrest* v. *Manchester R. R. Co.*, 4 De G. F. & J. 131; *Dering* v. *Earl of Winchelsea*, 1 Cox, 319. The motive of a suitor cannot be enquired into in such a case. *Wilbran* v. *Wilbran*, 5 Madd. 2; *Thornton* v. *Thornton*, 63 N. C. 212. Were it otherwise, nearly every suit would degenerate into a wrangle over motives and feelings.

The demurrer of the original complainants must, therefore, be sustained with costs.

The demurrer of Martin raises far more difficult questions, and, not being supported by any argument or brief by the counsel who filed it, might, for that reason alone, be overruled. But the counsel for Harris has furnished me with a well-digested brief of points and authorities, and it may narrow future discussion to give the result of my examination.

It is true, as suggested by the counsel, that it is well settled at law that the statute of frauds did not alter the form of pleading, and that, if the contract is stated in the declaration to have been made, it is not necessary to allege that it was in writing, as that will be presumed until the contrary appears. *Townsend* v. *Sharp*, 2 Tenn. 192; *Carraway* v. *Anderson*, 1 Humph. 61. It is a legitimate argument to

urge that, by analogy, the principle would equally apply to pleadings in chancery. And so Chancellor Walworth has held. *Cozine* v. *Graham*, 2 Paige, 177; *Champlin* v. *Parish*, 11 Paige, 405. But if the agreement, as stated in the bill, appears to be a parol agreement only, the defendant may by demurrer object to any relief founded thereon, the principle only applying where the statement is that a contract was made, without disclosing the fact that it was in parol. 2 Paige, 181; *Redding* v. *Wilkes*, 3 Bro. C. C. 400. In this case the bill clearly discloses that the promise was verbal, by averring that Martin "said" so and so.

The objection of the demurrer, that Harris could not sue until after he had sustained a loss, means, I take it, that he must actually have paid the money. For, if there can be a loss in any other sense, it has already been sustained, the bill showing that Childress has removed from the state, and is insolvent. The question then is: Has Harris a right of action before payment of the loss? If the promise had been to indemnify him *from loss*, the point would, probably, have been well taken. *Ward* v. *Fryer*, 19 Wend. 494; *Jones* v. *Shorter*, 1 Kelly (Ga.), 294. But the promise was: "You shall never be held liable upon the bond, or annoyed about it in any way," which is a promise to indemnify *against* *liability*. The rule upon such an obligation is that the right of action accrues as soon as the party becomes liable to pay, and it is not postponed until actual payment. *Webb* v. *Pond*, 19 Wend. 423; *Chace* v. *Hinman*, 8 Wend. 452; *Rockfeller* v. *Donnelly*, 8 Cow. 623, 639; *Gilbert* v. *Wiman*, 1 Comst. 550. The substance of the agreement, moreover, is that Martin will see that the debts secured in the deed of trust are paid, so that Harris shall not be annoyed by them. In this view, admitting the validity of the agreement, the case falls exactly within the principle settled in *Ranelaugh* v. *Hayes*, 1 Vern. 189; *s. c.*, 2. Ch. Cas. 146, the leading case on this branch of the law. There the Earl of Ranelaugh assigned several shares of the excise in Ireland, which he

held under obligations to the crown, to the defendant, who agreed to indemnify and save him harmless from all payments, charges, and actions on behalf of the crown. Upon bill filed, the defendant insisted that here was no proper subject of equity, but only a general and personal covenant of indemnity sounding in damages, to be ascertained at law. That the bill assigned no breach, and only that a suit had been brought against complainant, and, if nothing be recovered, there is no breach. But the Lord Keeper thought fit to decree that the defendant should perform his covenants, and referred it to the master, and directed that *toties quoties* any breach should happen, he should report the same specially to the court, and decreed that defendant should close the litigation in a reasonable time. And he compared it to the case of a counter-bond, where, although the surety is not troubled or molested for the debt, yet, at any time after the money becomes payable on the original bond, this court will decree the principal to discharge the debt, it being unreasonable that a man should always have such a cloud hang over him." To the same effect is the language of Chancellor Jones, in *Rockfeller* v. *Donnelly*, 8 Cow. 639, upon a similar bond: "When the obligation is to indemnify against damages or expenses, and the obligor has become absolutely bound and liable to pay the expense or damage incurred, it would surely be just and reasonable, and would violate no principle of law, to permit him to enforce his own demand against his obligor in the first instance, and before he satisfies the charge against himself." It is upon substantially the same principle that sureties are, under certain circumstances, permitted to come into this court in advance of payment, to obtain contribution, indemnity, or the benefit of liens and securities. *Dering* v. *Earl of Winchelsea*, 1 Cox, 318 ; *Henry* v. *Compton*, 2 Head, 549 ; *McKenna* v. *George*, 2 Rich. Eq. 15. Upon these grounds I am of opinion that the insolvency and non-residency of Childress, and that the creditors are seeking to hold Harris liable upon the trustee's bond, are sufficient to authorize

him to come into this court against Martin for relief, if the promise relied on be enforceable.

And this brings us to by far the most difficult question in the cause, upon which the authorities are irreconcilably in conflict. Our statute of frauds is : "No action shall be brought * * * whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person, * * * unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized." Code, § 1758.

If the question raised by the facts of this case were *de novo*, it would, perhaps, present little difficulty. "If," says Mr. Throop, "the question was merely whether the general policy of the statute embraces such cases, probably few lawyers would hesitate to answer it in the affirmative." Throop on Par. Agr. § 474. "Within the mischief of the statute," says Lord Denman, "it (a promise to indemnify) most certainly falls." *Green* v. *Cresswell*, 10 Ad. & E. 453. In *Easter* v. *White*, 12 Ohio St. 219—a thoroughly argued case, Mr. Justice Swayne, of the Supreme Court of the United States, being one of the counsel—Sutliff, J., in delivering the unanimous opinion of the court, says : "Independent, therefore, of the contrariety of opinions upon the subject already referred to, I confess the question would, to my mind, seem quite free from doubt. Whether we have respect to the language or the object, I think a reasonable effect can only be given to the statute by holding it to embrace every understanding or promise to another to be answerable to him, upon any contingency or condition, for the debt or default due, or to become due, from a third person to such promisee, and thereby becoming surety for such third person to the promisee." Perhaps it might be put even stronger, and we might say that, if there was any evil falling precisely within the letter and policy of the

statute, it would be the permitting a person who has actually bound himself by obligation, in writing, to throw the burden of the obligation upon another by parol.

But the question is not a new one, having been before the courts for nearly 200 years, and having been repeatedly passed upon by some of the ablest legal minds both of England and America. My duty, therefore, is, not to decide it as if it were now for the first time presented, but to ascertain whether, notwithstanding the conflict of decisions, the law may be considered as settled by the preponderance of authority in one way. For I am placed here, not to make the law, but to declare it as it already exists.

There is a long line of decisions on this branch of the statute, commencing with *Read* v. *Nash*, 1 Wils. 305; *Tomlinson* v. *Gill*, Amb. 330, and *Williams* v. *Leper*, 3 Burr. 1886; coming down through *Leonard* v. *Vredenburgh*, 8 Johns. 39; *Perley* v. *Spring*, 12 Mass. 297, and *D' Wolf* v. *Rabaud*, 1 Pet. 476; and ending with *Mills* v. *Mills*, 3 Head, 705, and *Emerson* v. *Slater*, 22 How. 28, which lays great stress upon the fact of a new and independent consideration taking a promise out of the statute. The rule to be deduced from them is thus broadly enunciated by Clifford, J., in *Emerson* v. *Slater:* "Whenever the main object of the promisor is, not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the debtor's liability." Text-writers have been unwilling to concede the existence of such a rule, and have succeeded, I am inclined to think, in ranging most of the cases upon which it is supposed to rest in some other category less exceptionable. The rule, if firmly established, would bear upon the state of facts before us.

Another class of decisions is more nearly in point. These are: *Thomas* v. *Cook*, 8 B. & C. 728; *Harrison* v. *Sawtel*,

10 Johns. 242; *Barry* v. *Ransom*, 12 N. Y. 462; *Jones* v. *Letcher*, 13 B. Mon. 363; *Jones* v. *Shorter*, 1 Kelly, 294, and *Blake* v. *Cole*, 22 Pick. 97. These are cases where the defendant, being already bound as surety or otherwise, induces the plaintiff to go upon the bond by a promise to indemnify him. But these decisions may be safely rested on the well-established doctrine that a surety may, by parol, limit the extent of his liability as between him and other parties to the paper. *Swain* v. *Wall*, 1 Rep. Ch. 80; *Craythorne* v. *Swinburne*, 14 Ves. 168; *Hartley* v. *O'Flaherty*, L. & G. *temp.* Plunk. 217; 1 Story Eq. Jur. § 477; *Deberry* v. *Adams*, 9 Yerg. 52. The recent case of *Bessig* v. *Britton*, 59 Mo. 204, is, however, a direct decision that such a promise is within the statute.

But in *Thomas* v. *Cook*, 8 B. & C. 728, the decision was rested principally upon the ground that a promise to indemnify another from liability upon a suretyship, undertaken at the request of the promisor, was not within the statute. The principle itself was expressly overruled in *Green* v. *Cresswell*, 10 Ad. & E. 453, Lord Denman saying, with unanswerable point, that the statute might always be evaded by making the promise a promise to indemnify.

The facts in *Green* v. *Cresswell* were that the plaintiff, at the request of the defendant, and upon his promise to indemnify him, had become bail for a third person in a civil suit. It was, therefore, a case almost identical in principle with the one before us, and the ruling was that the promise was within the statute of frauds. The correctness of the ruling has been seriously questioned in subsequent cases. *Fitzgerald* v. *Dressler*, 7 C. B., N. S. 374; *Batson* v. *King*, 4 H. & N. 739; *Cripps* v. *Hartnall*, 2 B. & S. 697; *s. c.*, on appeal, 4 B. & S. 414. In this last case the ruling was exactly the reverse upon the promise to indemnify bail in a criminal cause, the court saying that, however it might be in civil bail, in criminal bail there was no debt or duty due from the principal to the surety to indemnify him. This distinction has never been made in this country,

and two of the leading cases arose upon a promise to indemnify bail in a criminal proceeding. *Holmes* v. *Knights,* 10 N. H. 175; *Kingsley* v. *Balcome,* 4 Barb. 131. The latest decision in England is *Wildes* v. *Dudlow,* 23 W. R. 435; *s. c.,* 2 C. L. J. 317, where Malins, V. C., holds that a promise to indemnify is not within the statute, declaring the point to be "plain upon principle," but without stating the principle, or giving any reason.

The leading case in America is *Chapin* v. *Merrill,* 4 Wend. 657. There the plaintiff, at the request and upon the promise of the defendant to indemnify him, entered into a covenant with a mercantile firm that if they would supply a third person with goods he would guarantee payment. "This is clearly," says Marcy, J., "an original undertaking; it was not made with the party buying or selling the goods. The goods sold were not the consideration of the promise." The learned judge cites *Tomlinson* v. *Gill,* Amb. 330, and *Read* v. *Nash,* 1 Wils. 305, resting the decision, manifestly, on the independent or "new distinct consideration" upon which Lord Hardwicke laid so much stress in *Tomlinson* v. *Gill.*

*Chapin* v. *Merrill* was a decision of the supreme court of New York, and that court has since decided otherwise in *Kingsley* v. *Balcome,* 4 Barb. 131, and *Baker* v. *Dillman,* 12 Abb. Pr. 313. The court of appeals has never passed upon the point, although Comstock, J., in his elaborate opinion in *Mallory* v. *Gillett,* 21 N. Y. 412, treats such a promise as not within the statute.

In *Chapin* v. *Lapham,* 20 Pick. 467, Shaw, C. J., expressed the opinion, *arguendo,* that a promise to indemnify a surety, who became such at the request of the promisor, would not be within the statute, although the third person, upon whose bond he became surety, "may have been himself liable incidentally and upon a *promise implied by law.*" This was the opening wedge, which was driven home by the same eminent judge in the subsequent case of *Aldrich* v. *Ames,* 9 Gray, 76. There the precise point in this case was raised,

and the promise held to be binding. " The theory of the statute of frauds," says the chief justice, " is this : That, when a third party promises the creditor to pay him a debt due to him from a person named, the effect of such a promise is to become a surety or guarantor only, and shall be manifested by written evidence. But this is a promise to the debtor to pay his debt, and thereby to relieve him from the payment of it himself, which is not within the statute of frauds."

In *Holmes* v. *Knights*, 10 N. H. 175, Parker, C. J., comes to the same conclusion, though upon different grounds. He lays some stress upon the fact that it did not appear that the plaintiff had become surety at the request of the principal in the bond, while it did appear that he became surety only at the request of the promisor, and he thinks that the mere assent of the principal to the plaintiff becoming surety, where there was a request by a third party and a promise to indemnify, would not be sufficient to raise an implied promise on the part of the principal to indemnify the surety. He adds, however, that, if it did, such a liability might be held to be an original independent liability. " If either was to be deemed collateral, the liability of the principal in such case would seem in point of fact to be collateral to that of the defendant." This suggestion of the chief justice brings us back to the " trilateral contract " of Judge Story, in *D' Wolf* v. *Rabaud*, 1 Pet. 476, which has been severely criticised.

A like conclusion, though not upon the same reasoning, has been reached in *Hassinger* v. *Solmes*, 5 Serg. & R. 9 ; *Dunn* v. *West*, 5 B. Mon. 376 ; *Jones* v. *Shorter*, 1 Kelly (Ga.), 294 ; *Beaman* v. *Russell*, 20 Vt. 205 ; *Mills* v. *Brown*, 11 Iowa, 314 ; *Vogel* v. *Melms*, 31 Wis. 306. The opposite conclusion was arrived at in *Draughan* v. *Bunting*, 9 Ired. 10 ; *Brush* v. *Carpenter*, 6 Ind. 78 ; *Easter* v. *White*, 12 Ohio St. 219 ; *Brown* v. *Adams*, 1 Stew. 51 ; *Simpson* v. *Navee*, 1 Spears, 4 ; *Griffith* v. *Frederick City Bank*, 6 Gill. & J. 424 ; *Bessig* v. *Britton*, 59 Mo. 204. There are,

29

counting Massachusetts and New Hampshire on the one side, and New York on the other, eight states for, to eight against. The English cases, as we have seen, are directly in conflict with each other. It is not absolutely certain, therefore, that Cole, J., is right when he says, in *Vogel* v. *Melms*, 31 Wis. 311, "that a preponderance of authority sustains the doctrine that a promise to indemnify a surety for becoming responsible for the principal, made by a third person, at whose request and upon whose credit the surety enters into his engagement, is not within the statute." On the contrary, there would seem to be an equilibrium of antagonistic forces.

Where the weight of authority is so evenly balanced, the scales of justice may be made to turn by the logical merits of the principles on which the decisions are rested, or by considerations of public policy. The difficulty of finding a principle which logically leads to the conclusion that a promise to indemnify is not within the statute is evidenced by the fact that no two of the decisions to that effect assign the same reason. At the outset it was the existence of an independent consideration that swayed the master minds of Lord Hardwicke in *Tomlinson* v. *Gill*, of Chancellor Kent in *Leonard* v. *Vredenburgh*, and of Mr. Justice Story in *D' Wolf* v. *Rabaud*; Chief Justice Shaw puts his decision on the ground that the promise, to be within the statute, must be to the creditor, whereas the promise to indemnify is made to the debtor; Chief Justice Parker, with better logic, insists that the promise to indemnify is the main inducement to the risk, even if the principal obligor be also bound, either expressly or by implication; while the supreme court of Kentucky rest their ruling on the ground that the action in favor of the surety against the principal obligor would be founded upon an *assumpsit* raised by a subsequent fact, to wit, the payment of the debt, which would not prove that there was any contract, express or implied, between him and the surety, when the obligation was signed. In other cases the courts seem to be influenced rather by the

inherent equity of the particular case than by any con-
nected chain of reasoning which will stand the test of logic.
A line of decisions sustained by such diverse reasoning, and
resting upon no universally recognized principle, cannot be
relied upon as a sure guide. It is easier, and just as satis-
factory, to say with Malins, V. C., that the point is "plain
upon principle," and give no reason at all. It is obvious
that the decisions rest upon nice refinements, and not upon
substantial distinctions. On the other hand, we have the
earnest lament of Lord Kenyon at an early day, and since
echoed by several of his eminent successors on the bench,
that the courts had not from the first abided by the strict
letter of the statute. *Chater* v. *Becket*, 7 T. R. 201.
Lord Eldon, too, concurred in the same sentiment. "I
feel," he says, "all the disinclination which has been lately
expressed, and strongly expressed in many cases, to carry
what may be called the struggles of courts of justice to
take cases out of the reach of the statute farther than they
have been carried." *Cooth* v. *Jackson*, 6 Ves. 37. Warned
by these utterances of the great English judges, the courts
of this state determined to construe the statute rigidly.
Contrary to the current of authority, they held at an early
day, and have adhered to the ruling, that part performance
of a parol contract would not take it out of the statute.
*Patton* v. *McClure*, M. & Y. 333. So, contrary to
the very point on which a promise is, by some other courts,
taken out of the statute, they determined that the promise
must be in writing, whether made to the debtor or creditor.
*Campbell* v. *Findley*, 3 Humph. 330. The decisions ought
to be uniform, or, at any rate, well grounded in principle,
to induce a departure from this settled policy. It may be
true, as intimated by an eminent American judge, that it is
questionable whether this part of the statute of frauds has
not promoted more fraud than it has prevented. *Per* Parker,
C. J., in *Holmes* v. *Knight*, 10 N. H. 175. And, no doubt,
this very fact has led the courts to depart from the letter of

the law. But the remedy is in changing the statute by proper legislation, not in frittering it away by nice refinements and abstruse subtleties—"more than cool reason ever comprehends." Fearne on Contingent Remainders is not more abstruse, or difficult to follow in its distinctions, than the elaborate treatises on this very branch of the statute of frauds. It seems safer to me to adhere to the letter than to attempt to follow the "erring spirit," often as impossible to materialize into a tangible shape as the spirit of our disembodied friends.

Nevertheless, as there is in this case, as developed on the face of the bill, a combination of all the various elements usually relied on to take the case out of the statute, and one especially upon which the doctrine must rest if it is to be maintained as sound, I have concluded to overrule the demurrer and open the case for proof and further argument. The element referred to is the absence of any request of Childress to Harris that he would become his surety. In the absence of such request there is some plausibility, to say the least, in arguing that the law does not imply a promise from Childress to Harris until the latter has actually paid money by reason of the suretyship, and, consequently, that the promise of Martin was original, not collateral. True, the principal's liability to the surety and the indemnifier's liability to the surety must relate to the same point of time—the moment when the surety signs the bond; are based on the same consideration—the obligation incurred; and are contingent upon the same event—the principal's default. Still, there is a positive promise on the one part, an implied one on the other, and the surety might be allowed to elect which promisor he would treat as the principal debtor, just as the merchant who sells goods to one person, at the request of another and on his promise to pay, may elect to which he will give the credit, and, by such election, bring the promise within or take it out of the statute. The question is worthy of reargument and a further consideration.

The demurrer of Martin will be overruled, with leave to rely upon the matters of demurrer in his answer.

NOTE.—At the hearing of the cause upon its merits, the decision was against the complainant in the cross-bill, both on the facts and the law.

The Chancellor said: The promise to indemnify, if made, is averred to have been in parol. The defendant Martin positively denies the promise, both in his answer and his deposition. There is no other direct evidence on the point, except that of Harris. The burden of proof is not only upon him, but, if such a promise can be shown by parol, it is obvious that the evidence ought to be clear and conclusive beyond a reasonable doubt. The reliance is upon the support given by other witnesses, and especially Childress, to the evidence of Harris, whenever it is in conflict with the evidence of Martin. Childress proves that Harris did not go security for him at his instance, as Martin claims. The weight of testimony is undoubtedly in favor of Harris on all the collateral facts and circumstances. I am satisfied that he became the surety of Childress at the urgent request and solicitation of Martin, and without any application from Childress, and solely to befriend the former. But I am not satisfied, even in such case, where the other party denies the promise, that a binding obligation in parol can be made out by the evidence of the promisee alone. Nor do I think that Harris, by his testimony, makes out the express promise charged in the bill. At most, it only shows a request, and a yielding to importunity, under the belief, brought about by the assurances of Martin, that the property was ample to pay all his debts; that the object of the deed of assignment was to prevent a sacrifice of his property for the payment of debts as surety for a third person, who had made a similar assignment of his property, and that he, Martin, would see that the property assigned by him was properly applied to the payment of his debts. The promise to indemnify is rather to be implied from the request and solicitation, than express. I am unwilling to

allow a surety who has, in writing, become responsible "for the debt, default, or miscarriage of another," to shift the burden from his own shoulders by parol testimony from which the court is expected to *imply* a promise as a fact, not as arising from the circumstances or the relations of the parties. The promise, to work such a result in such a case, should be express, and established beyond a reasonable doubt.

But, if the promise were clearly proved, I am of opinion, under our decisions, which adhere to the letter of the statute of frauds and avoid the nice refinements of other courts, that it would not be binding unless in writing. I reviewed the authorities when the case came before me on demurrer, and do not deem it necessary to go over the same ground again. They are hopelessly in conflict, not merely in their conclusions, but in the reasoning on which those which have come to the same conclusion are rested. The courts of this state are, therefore, free to construe the statute for themselves, and as they have heretofore adhered to a literal construction, my duty is to follow them.

Besides, as it seems to me, where one person becomes surety for another, at the latter's request and for his benefit, the request necessarily implies a promise of indemnity; and if another person unites with the first in the request, and makes an express promise to indemnify the surety, his promise must necessarily be within the statute, because collateral to the implied promise of the principal. And, as it also seems to me, this result is not changed by the fact that the promise of the principal does not result from a request by him that the surety should become bound as such, but results by operation of law from the existence of the relation of principal and surety. The obligation of a principal to indemnify his surety, like the obligation of co-sureties to each other, stands upon a principle of equity, and dates from the creation of the relation. *Bathurst* v. *De La Zouch*, 2 Dick. 460; *Boyd* v. *Brooks*, 34 Beav. 7. And, as was said by Sir Samuel Romilly in argument, and repeated by Lord

Eldon, as Lord Chancellor, in *Craythorne* v. *Swinburne*, 14 Ves. 169, "after that principle of equity has been universally acknowledged, then persons acting under circumstances to which it applies may properly be said to act under the head of *contract implied from the universality of the principle.*" It is the creation of the relation, no matter how brought about, which fixes the relative rights of the parties. The implied liability of the principal to his surety, growing out of the fact of suretyship, is one of those presumptions which cannot be disputed. Whenever it exists, any promise to the surety to indemnify him against the same liability is necessarily within the statute.